Hillsborough, {
June 7, 1932. {

HAROLD ROBERTS, *by his father and next friend,*

*v.*

HILLSBOROUGH MILLS.

*Robert E. Earley*, and *Doyle & Doyle* · (*Mr. Paul J. Doyle* orally), for the plaintiff.

*Lucier & Dowd* (*Mr. Lucier* orally), for the defendant.

Snow, J.   I. Any workman injured while in the employment of one who has accepted the workmen's compensation act may elect to receive compensation thereunder or to bring an action at common law for negligence.   By the terms of the statute an injured workman is barred from recovery in such an action by "accepting any compensation" under the act, by giving the prescribed notice or by "beginning proceedings therefor in any manner."   P. L., *c.* 178, *s.* 11.   The pursuit of either the statutory or common-law remedy releases the employer from liability under the other.   *Gordon* v. *Company*, 83 N. H. 221, 222.   The statute presupposes capacity in the actor to make an election of remedies.   *Davis* v. *Company*, 82 N. H. 87, 88.   Such an election requires the exercise of knowledge, judgment and discretion of which the law presumes an infant incapable.   There is nothing in the statute indicating any purpose to bestow upon minor workmen power to act *sui juris*.   *Moore* v. *Hoyt*, 80 N. H. 168, 170, 171.   The use of the general terms "workman" and "workmen" to designate the beneficiaries of the act carries by implication no enabling power to one incompetent to act in his own behalf.   On the contrary, the power to petition the court for relief upon failure of the employer to make compensation under the act is expressly given to "the injured workman, or his guardian, if such be appointed ..."   *s.* 25.

Like power is given the guardian of "an injured workman" who "shall be mentally incompetent." *s.* 33. Not only by the absence of any enabling provision, but by implication from its express terms, the statute leaves workmen who are infants or *non compos mentis* to the enforcement of their remedies thereunder in the manner in which such rights are customarily asserted. It discloses no intention to trench upon the protection which the present day common law affords to the incompetent. *Moore* v. *Hoyt, supra; Stephens* v. *Duxbridge Iron Works,* [1904] 2 K. B. 225, 229, 230.

Obviously decisions under workmen's compensation acts which expressly, or by necessary implication, bestow upon infant employees the status of adults are not here pertinent. 14 A. L. R. 818; 33 A. L. R. 337; 49 A. L. R. 1435; 56 A. L. R. 887; 60 A. L. R. 847; 36 Harv. L. Rev. 892.

Ordinarily there are only two recognized ways in which a minor may take binding action in the enforcement or discharge of his legal rights, namely, through a duly appointed guardian acting within his powers, or through his next friend by proceedings in court. *Clarke* v. *Gilmanton,* 12 N. H. 515, 517; *Beliveau* v. *Company,* 68 N. H. 225, 227; *Strong* v. *Company,* 82 N. H. 221, 222, 223. Neither method having been employed, it was his legal right to repudiate the assumed election in his behalf. The ruling of the court that the mother had no authority to bind the plaintiff is sustained.

Neither the statute, nor the procedure applicable to minors, required any particular form of disaffirmance of the election purporting to have been executed in the plaintiff's behalf. The bringing of the action at law through his next friend was a sufficient repudiation thereof. See *Eaton* v. *Hill,* 50 N. H. 235, 241; *Stack* v. *Cavanaugh,* 67 N. H. 149, 155.

The defendant, however, contends that as the election was partially executed there could be no rescission thereof except upon a "tender back" of the compensation received. This contention invokes the rule that a minor seeking to avoid an executed contract on the ground of his infancy must account for what he has received under it, by restoring or paying the value of whatever remains *in specie* within his control and allowing for the benefit derived from whatever cannot be so restored. *Hall* v. *Butterfield,* 59 N. H. 354, 358; *Bartlett* v. *Bailey,* 59 N. H. 408; *Stack* v. *Cavanaugh, supra,* 155; *Wooldridge* v. *Lavoie,* 79 N. H. 21, 22. If the rule were otherwise applicable here, the defendant fails for want of proof. Under the rule, failure to restore is a prerequisite to the maintenance of a minor's

action only under the conditions laid down. Of these the defendant had the burden of proof. It does not appear that any part of the moneys paid remained unspent in the plaintiff's possession or within his control at the date of the writ, and no presumption will be indulged to that effect. The principle of the rule invoked, however, is inapplicable here. Compensation when elected is paid by statutory direction and not by virtue of any contract to accept it. *Eleftherion* v. *Company*, 84 N. H. 32, 34. See *Moore* v. *Hoyt, supra*, 169. In so far as the acceptance of compensation discharges the defendant's common-law liability, it is a statutory and not a contractual bar. There being no valid agreement to accept compensation or to discharge the plaintiff's right of action, there was no contract to rescind. *Hamel* v. *Company*, 73 N. H. 386, 389; *Genest* v. *Company*, 75 N. H. 365, 368. The defendant's motion to dismiss was properly denied.

The right of the defendant to repayment, or to an accounting for the sums advanced by way of compensation, arises from an implied obligation based solely on equity and good conscience. It was the defendant's right to decline to make payments by way of compensation until the authority of the mother to bind the plaintiff had been established by her appointment as guardian, or by the bringing of the appropriate petition as his next friend. There being no evidence of fraud, the defendant must be presumed to have made the payments with a full knowledge of the legal privileges that the law accords to infants. The extent of the defendant's legal right in this action, as respects the compensation paid, is to offset the payments made against the damages recovered by the plaintiff. The defendant's right to such offset is conceded by the plaintiff.

II. The plaintiff was of retarded mentality, having spent four years in making the fourth and fifth grades of the grammar school, following which at the age of sixteen he entered the defendant's employ as an oiler boy, and was assigned to the "drawing room." His principal duty was lubricating machines with a brush or a can. When using the latter he followed instructions to stop the machine and tighten a check nut so that it could not start. His spare time was spent in gathering up waste, sweeping the floors and wiping up oil around the machines. After about a year's service as oiler boy he was assigned to the operation of three two-spindle gillbox machines, situated in the drawing room. On each machine are two aprons, each six inches in width, which come out between two steel rolls and pass up over a top guide roll in the form of belts and thence downward

on the back side, the rolls on which they are belted being two and a half inches in diameter. The function of the machines is to blend several laps of wool into a sliver by reducing five ends into one. The stock, entering the back of each machine at the bottom, comes to the front between the steel rolls and on the outside of the belt and is carried upward on its outer surface. The purpose of the aprons is to prevent the wool from coming in contact with, and being caught by, the surface of the rolls. Lint from the stock gathers upon the apron and must be removed with each change in color. This may be accomplished by the open palm of the hand or by means of a hand card, which is a brush consisting of a leather surface, studded with closely packed wire bristles, fastened to a short flat stick whittled at one end in the form of a handle. Held against the moving apron with some pressure the hand or the card will effectively remove the lint.

One operator has charge of three similar and like operated machines through which the material successively passes before it goes to the heavy dryer. While serving as oiler boy the plaintiff had observed the operation of the gillboxes by others who showed him "some things" about it, and on one or more occasions he had run one of them. Mr. McGrath, the defendant's overseer, assigned him to the work, saw him start the machines and watched him operate them for five or ten minutes. McGrath "told him to be careful," but gave no instructions as to the operation of the machine or the manner of cleaning the aprons. His excuse for failing to instruct was—"when I asked him if he knew how to run the machines he said yes." The plaintiff had been operating the machine about two weeks when he received his injury. In the meantime he ran the boxes properly, kept up his end of the production and turned out good quality of work.

The accident occurred while the plaintiff was removing lint with the palm of his right hand. The apron turned under the pressure causing the hand to slide sidewise concurrently with the slipping of his feet upon the oily floor, by reason of which combined causes he lost his balance and fell. In his fall he caught hold of the upper of the two lower rolls with his left hand, the fingers of which were drawn between the rolls and crushed. His was the sole testimony of the occurrence. "I was cleaning the machine with my right hand . . . going across it, the belt slipped and my feet slipped at the same time and I went forward and I grabbed ahold of this roll and I caught my hand . . . Q. What made your hand slip . . . off the belt? A. The belt twisted. . . . Q. Do you know what made your foot slip?

A. It must have been the oil on the floor. Q. Was there any oil there or not? A. Yes. Q. When did you see the oil there? A. In the morning when I went to work."

There was no evidence of any defect in the machine or want of safety in the work-place except the oil on the floor of which the plaintiff had admitted knowledge. These issues were withdrawn. The evidence of the want of proper instructions, upon which issue alone the case was submitted, was addressed solely to the failure of the defendant to instruct the plaintiff to use the card instead of the hand in removing the lint. The defenses were (1) that there was no occasion to instruct him as he knew of their use by observation and by having his attention directly called to them, (2) that cards were not designed or used as a matter of safety to employees, but as a better means of securing complete removal of the lint, (3) that the use of the card would have afforded no additional protection to the operator.

The defendant's evidence tended to show that the original mode of cleaning the aprons was by the use of the hand, but that with the advent of colored stocks, six or eight years prior to the accident, the use of the card was adopted as a more effective method of keeping each lot of stock to its own color; that cards were supplied, and their use was required by instruction to all operatives; that such had been the invariable practice during the service of the plaintiff as oiler boy; that during such employment he worked a part of every day with the operators of the gillbox machines; that, on the morning the overseer set the plaintiff at work on the machines, the "fixer," one of whose duties was to receive from the overseer and transmit instructions to the operators, said to the plaintiff "Harold the . . . card is on the post" eliciting the reply "all right." The plaintiff denied this statement and testified that his knowledge of operating the machines was acquired solely by "watching the fellows" who ran them; that they always cleaned the apron with their hands; that, during the two weeks he operated the machines he removed the lint with his hand three or four times daily, or thirty or forty times during the two weeks; that he received no directions to use a card, and in fact never saw one until it was produced in the preparation of the case for trial. Manifestly, it could be found that he was uninstructed and uninformed as to the use of the card.

While there was evidence that the card protected an operator from injury by contact with the apron or getting his hand caught between the belt and roll, there was no direct testimony that the brush would prevent slipping. There was evidence, however, that some consider-

able pressure with the hand was necessary to remove the lint; that the amount of pressure required varied with the material; that the apron was flexible and would yield or twist in proportion to the force applied. The belt was smooth and moved "fairly fast." It is a matter of common knowledge that in such a case the rough surface of a card studded with closely packed wire bristles when pressed against the apron would offer greater resistance to slipping thereon than would the smooth surface of the hand. It could be found that the card would have afforded greater protection to the operative from the encountered danger, and that an ordinarily prudent person in the defendant's position would have instructed an operative of the plaintiff's mentality and limited experience to use it instead of the bare hand.

If it were conceded that the presence of the oil upon the floor was a concurrent cause and the danger it presented an assumed risk, it could nevertheless be found that the defendant's failure to instruct the plaintiff to use the brush was an efficient cause of his fall. *Vaisbord* v. *Company*, 74 N. H. 470, 473, 474. Whether it was the proximate cause was a question of fact for the jury. *Ela* v. *Company*, 71 N. H. 1, 3; *Prichard* v. *Boscawen*, 78 N. H. 131, 133; *Robertson* v. *Monroe*, 80 N. H. 258, 261, 262; *Dervin* v. *Company*, 81 N. H. 108, 111, 112. The defendant's motions for a nonsuit and for a directed verdict were properly denied.

III. One Rood, who had operated the gillboxes for the defendant for a period of several years ending about two years before the accident, was called by the plaintiff. Having testified that McGrath was his overseer at that time, and that he cleaned the aprons sometimes with his hands and sometimes with the card, he said the men "were told not to use the card because it wears out the apron . . . too much using the card cut up your apron." In argument the plaintiff's counsel, subject to the defendant's exception, said "Brother Lucier said we produced a man here today by the name of Rood, and he said that when he worked for the mill that there was cards around there, plenty of them, and he said we used to do the work both ways, with and without the card, four and one half years [ago], he got through there then, what did he say, who was his boss at that time [two years before the accident], who was it, McGrath, the same overseer you have got today. What does he say that McGrath said to him? He said that the boss came around and told them what? Stop using these hand cards. Why? It was tearing the apron." [Exception.] . . . "on the other hand Mr. Rood says that four and one

524

half years ago when he left them that they were ordered by the overseer, the same overseer you have got today, to stop using these brushes and they did." [Exception.] ... "I will change that, Your Honor, that some time while Mr. Rood was working for them and he had got through working I should put it four and one half years ago, and sometime while he was working for them the orders came from the overseer to stop using this brush." [Exception.]

McGrath was an important witness for the defendant and testified to the continuous and exclusive use of the cards, under his instructions, for some seven years immediately prior to the accident. It is the defendant's position that the statement attributed to McGrath was unsupported by the evidence and unduly prejudicial. That it was prejudicial may be conceded; it was directly contradictory of his testimony. It is not so clear, however, that it was not a fair deduction from the record. The defendant's superintendent testified that directions to operators were given by him to the overseer who instructed the workers; that McGrath had been the overseer in the drawing room for ten or twelve years. If counsel had asked the jury to infer from the evidence that the orders to the operator Rood came from his overseer McGrath, who had the charge of the drawing room and whose duty it was to transmit orders, he would have been clearly within his rights. An assertion in argument, as a fact, of an inference fairly deducible from evidence is not a ground for setting aside a verdict. *Maravas v. Corporation*, 82 N. H. 533, 538; *Piateck v. Swindell*, 84 N. H. 402, 404.

The defendant's exceptions to evidence have not been urged, and have not been considered.

*Exceptions overruled.*

PEASLEE, C. J., was absent: MARBLE, J., did not sit: the others concurred.